**TANNER et al. v. REEVES et al.**

**TANNER et al. v. CARVER et al.**

Court of Appeals of Kentucky.
May 30, 1952.

W. D. Gilliam, Scottsville, for appellants.

N. F. Harper, Scottsville, for appellees.

CULLEN, Commissioner.

Dr. J. Leland Tanner, owner of oil leases covering two tracts of land in Allen County, appeals from a judgment, entered in consolidated actions brought by the landowners, which cancelled the leases and adjudged the landowners to be entitled to the equipment installed under the leases. The judgment was based upon a finding that the lessee had breached the implied covenants of the leases for diligent development and operation, and had abandoned the leases.

The appellant contends that: (1) The landowners, by their acceptance of dwindling royalties, and by their failure to voice any complaint concerning the manner in which the leases were being operated, acquiesced in the failure of the lessee to diligently operate the leases, and waived any right to demand a forfeiture for breach of implied covenants; (2) the landowners could not claim a forfeiture, for lack of diligent operation, without first giving notice to the lessee of their dissatisfaction, and making a demand upon him for improvement of the methods of operation; and (3) the lessee cannot be charged with abandonment, because his failure to operate the leases for a period of more than one year immediately preceding the commencement of the actions, on which failure the charge of abandonment was based, was due to breach of contract by a person he had employed to rehabilitate the wells and the pumping system.

The tracts of land in question are the Reeves tract, containing 150 acres, and the Carver tract, containing 85 acres. The Carver lease was executed in 1916, and the Reeves lease in 1922, by predecessors in title to the present landowners. The leases were to run for primary terms of 5 years and 2 years, respectively, "and as long thereafter as oil * * * is produced therefrom." Each lease provided a one-eighth royalty for the landowner. Neither lease contained any express provision as to forfeiture for lack of diligent operation or production.

Shortly after the leases were executed, several producing oil wells were drilled on each tract of land, and pumping operations were commenced. The operations continued in a satisfactory manner, through several changes of ownership of the leases, until 1943. During this period the royalty payments on the Reeves lease averaged between $15 and $20 per month, and those on the Carver lease between $8 and $10 per month.

In 1943 the leases changed hands, and the production began to dwindle, apparently because of less satisfactory methods of operation. In 1947 the leases were purchased, along with nine other leases in the neighborhood, by the appellant, Dr. Tanner. The latter did not undertake to exercise any personal supervision over the operation of the leases, but during 1947 and 1948 his partner, a Mr. Selover, operated the leases. During these two years there was a marked decrease in the production from the wells. The pumps were out of operation from time to time, salt water entered the wells, and the equipment deteriorated. The owner of the Reeves land testified that in 1947 his royalty payment was around $50, and in 1948 he received only $1.50. The owner of the Carver land did not recall the amounts of his royalty payments for those years, but he said they were negligible.

In June 1949, the power plant used in operating the pumps on the two leases in question, and on the third lease on which the plant was located, was destroyed by fire. Between that time and the time the actions to cancel the leases were brought in June

1950, no operations of any kind were conducted on the leases, and at the time the testimony was taken in November 1950 the power plant had not been replaced and no work had been done towards putting the wells back in production.

The landowners testified that after the power plant burned, pipes and other equipment on the surface of the leased premises were removed, and a tank was taken from one of the tracts; that no one made any effort to take care of the leases; and that the casing and tubing in the wells became in bad shape. They further testified that they received no royalty payments during 1949 or 1950.

Dr. Tanner does not dispute the testimony of the landowners as to the nature of the operations during 1947 and 1948, or as to the failure to operate at all after the power plant burned in June 1949. However, he seeks to excuse the failure to operate on the ground that he made a contract with a Mr. Banks, in July 1949, under which Banks was to rehabilitate all of the wells on the various leases owned by Dr. Tanner, and that Banks failed to perform the contract. The contract provided that Banks would clean and test all of the wells, and place in operation such of the wells as were productive; Banks was to do all work and pay for all equipment necessary to put the wells back in operation, and he and Dr. Tanner then were to share equally in the profits.

It is clear from the contract, and from Dr. Tanner's testimony, that he considered the leases a losing investment, and he did not desire to put in any more of his own money. The contract with Banks contemplated a sort of salvage operation, in which Banks, without any further investment of funds by Dr. Tanner, would attempt to put back into production such of the wells as might prove capable of profitable operation.

We are of the opinion that, under the circumstances, Dr. Tanner cannot escape the consequences of his failure to operate the leases by pleading the breach of contract by Banks. Dr. Tanner was the lessee, and it was his obligation to keep the wells in production. His contract with Banks represented only an effort on his part to get someone else to provide the labor and money necessary to rehabilitate the wells. The evidence shows that Dr. Tanner became aware of the breach of contract in December 1949, yet for almost a year thereafter he permitted the leases to remain idle.

As we view the case, the question of whether the landowners, by accepting the meager rentals and voicing no protest concerning the indifferent operations, waived or ratified the lack of diligence in operation of the leases during 1947 and 1948, is not important. The significant fact is the complete cessation of operations for more than 18 months prior to the trial of the actions, accompanied by removal of equipment and a practical disclaimer by the lessee of the intent to invest any more money in the leases.

Although the cessation of operations, with the accompanying circumstances related above, may not be sufficient to establish an abandonment in the sense of a voluntary and intentional relinquishment by Dr. Tanner of any further interest in the leases, it does establish such a failure to comply with the implied covenants of the leases as to achieve the same result as an abandonment. See American Wholesale Corp. v. F. & S. Oil & Gas Co., 242 Ky. 356, 46 S.W.2d 498; Hails v. Johnson, 204 Ky. 94, 263 S.W. 679.

In Monarch Oil & Gas Co. v. Hunt, 193 Ky. 315, 235 S.W. 772, a period of one year was held to be an unreasonable time to delay development under an oil lease. The Court said:

"An oil well from which no oil is produced is, as to the lessor waiting for royalties, as no well at all. * * * If after drilling a well in which there is oil or gas the lessee goes away and leaves it for an unreasonable time without an effort to further develop the lease or market the oil, it will amount to an abandonment of the lease unless the lease is kept in force by the payment of rentals or in some other way, * * *."

In Hodges v. Mud Branch Oil & Gas Co., 270 Ky. 206, 109 S.W.2d 576, where the lessee drilled one gas well and then, because of lack of a suitable market for the gas,

did nothing more for a period of three years, it was held that the failure to develop the lease was in effect an abandonment.

We concur in the finding of the chancellor, in the case before us, that the leases were in effect abandoned by Dr. Tanner. Under the circumstances, the landowners were not required to give notice and demand for further development before seeking to cancel the leases. American Wholesale Corp. v. F. & S. Oil & Gas Co., 242 Ky. 356, 46 S.W.2d 498.

The judgment is affirmed.